### BERRY TILLMAN v. THE STATE.

#### No. 3918.   Decided March 20, 1907.

**Murder in Second Degree—Charge of Court—Peaceful Mission—Intent.**

Where upon trial for murder the evidence showed that defendant was at his home pursuing his legitimate vocation, and the deceased and others surrounded his house at night, all armed, upon what· appeared to defendant a mission to do him harm, etc., and according to his testimony attempted to break into the house, and when they got inside defendant shot at them, and as they ran deceased fell, it was error to charge that if the parties went to said house on a peaceful mission, etc., the killing would not be self-defense, unless, etc., but murder in either the first or second degree.   See opinion for charge which is clearly erroneous for many reasons.

Appeal from the District Court of Grimes.   Tried below before the Hon. Gordon Boone.

Appeal from a conviction of murder in‎ the second degree; penalty, fifty years imprisonment in the penitentiary.

The opinion states the case.

*E. A. Berry, W. W. Meachum,* for appellant.—Richardson v. State, 7 Texas Crim. App., 486; Weaver v. State, 19 Texas Crim. App., 547.

*F. J. McCord,* Assistant Attorney-General; *Dean, Humphrey & Powell,* for the State.—Shannon v. State, 35 Texas Crim. Rep., 2; Airhart v. State, 40 Texas Crim. Rep., 472; Winters v. State, 51 S. W. Rep., 1110; Hall v. State, 66 S. W. Rep., 785.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for fifty years.

Appellant, a negro, an employee of W. E. Bonner, a white man, and one Oscar Kelton, a white man, on the evening before the homicide had a difficulty in which both drew pistols but neither fired.   Two or· three weeks before the homicide appellant received a letter in which it was stated: "You wind up your business, in short, and get away from here,"‎ which was signed "Committee."   This letter appellant

showed to the sheriff of Madison County and asked his advice thereon.
The sheriff told him he did not think there would be any trouble,
and just to go and say nothing to anybody, and that if Ben Ford went
with him to buy timber he (the sheriff) didn't think there would be
anybody to bother him. On the same evening after the trouble with
Oscar Kelton, appellant sought again the advice of the sheriff and
of his employer W. E. Bonner, and wanted to leave town, as he feared
trouble, but as his employer insisted on his remaining until to-morrow,
because he could not spare him, as he (Bonner) did not know anything
about the timber, and Bonner and the sheriff both told him that they
did not think he would have any trouble, if he remained quietly at
his boarding place. He went to his boarding place, and was working
at his account book at end of the dining room table, and was there
at the time of the homicide. In the house with appellant were Big-
gers, Carter, Johnson and Wilson, who were working for appellant
at the time in the timber business. All were negroes. The deceased,
Sam Seay, Tom and Ed Bozeman, Joe Floyd, and John Brownlee,
and others, all armed with pistols, and Oscar Kelton with a shotgun,
about 9 o'clock at night went to the boarding house of defendant,
as the State witnesses put it, "for the purpose of giving the negro
a talk and informing him that he had to put a stop to that or leave
the country." The State's testimony shows that deceased walked up
to appellant's boarding house and asked for appellant; some one re-
plied that he was not there. Deceased said "Yes, he is here; these
negroes said he is here, and tell him to come out here, I want to see
him a few minutes." The door was closed and deceased said "Tell
him to come out here, we don't want to hurt him; we just want to
talk to him." Then deceased stepped on the gallery and the shooting
commenced from the inside of the house. Deceased jumped off the
end of the gallery about the time the shooting commenced, and ap-
pellant jumped out on the gallery and threw his gun on deceased and
shot him, from which wound he died in a short while. This is in
substance the State's case.

Appellant's testimony shows that deceased called for appellant to
come out, he wanted to see him a minute and talk with him. Appel-
lant did not answer and deceased called him again, and remarked
"Tillman, if you don't come out here, I will blow that God damn thing
up." Appellant did not come out, but a negro preacher named Carter
partly opened the door and said: "Tillman is not here," which the
deceased contradicted. The preacher reiterated it, to which deceased
replied: "You are a God damned old lying son-of-a-bitch; he is there."
The negro again denied and deceased said, "We will have to get him
out of there," and deceased and witness named Bruce got upon the
gallery, and deceased said: "We are going to have the negro," and
both run against the door of the boarding house, and knocked it open,
and when they got inside of the house deceased pulled his pistol and
shot, and the negroes immediately fired after said shot, and they run

out of the room, and just as they got off the edge of the gallery deceased fell. The firing then became general between the parties in the house, and deceased's party on the outside of the house. One negro, Lige Biggers, was shot back in the hip with about nine buckshot; there were eight shot holes showing they came from the outside; two in the bedstead, eight or nine buckshot in the middle of the door facing, and a lot of buckshot which went into and clean through the chimney. There were one or two shots fired from the inside of the house on the other side of the house which went out. All the parties were armed at the negro's home either with pistols or shotguns.

Paragraph 35 of the court's charge is as follows: "Should you believe from the evidence that deceased, Sam Seay, accompanied by others, went armed at night, on a peaceful mission to the house occupied by the defendant, Berry Tillman, for the purpose only of remonstrating with him, said defendant, about his alleged conduct, and with no intent to inflict any serious bodily injury upon the defendant, and that while on said premises, the said Sam Seay and those accompanying him made no demonstration or committed no act or spoke no words evidencing an intention on their part or the part of any of them to commit any unlawful act or to inflict serious bodily injury upon the defendant, and you further believe from the evidence beyond a reasonable doubt that the defendant, Berry Tillman, shot and killed the deceased, as charged in the indictment, and that such killing was not in defense of himself, against an unlawful attack reasonably threatening death or serious bodily injury, viewed alone from his standpoint at the time, and you further find that the same was done with malice, you will find the defendant guilty of murder, either in the first degree or second degree accordingly as you find the malice to have existed, or to be implied as hereinbefore defined." This charge is clearly erroneous for many reasons. In the first place there was no evidence in this record that the parties went to the defendant's home on a peaceful mission; in the second place there is no evidence in this record showing that defendant knew that they were coming positively but merely apprehended the danger from unknown parties. The court should not have permitted the State's witnesses to testify what was their motive in going to the house. Their motive though, as stated, by themselves was intensely reprehensible and unlawful, and there is no evidence in the record of any peaceful purpose. Before a defendant can be bound by the acts of the party that he kills he must know of said acts, and also of said intentions. The defendant here was at his home peacefully pursuing his legitimate vocation unaware of the approaching danger, not knowing the purpose, object and intent of the parties that surrounded his little boarding house. This being true, how could appellant be bound by the intent of the parties, which intent he knew nothing of? The evidence in this case does not suggest either murder in the first or second degree; since there is nothing in this record to show that appellant knew any of the parties, but

the uncontradicted testimony is that he apprehended harm from unknown parties, and this record shows that these parties were unknown to appellant, or at least does not show that he did know them, and where parties go to one's house at night time, all armed, upon what appears to appellant a mission to do him harm, and laboring under a degree of anger or fear or resentment, which renders his mind incapable of cool reflection, if he shot said parties for said purpose alone, he would not be guilty of any higher offense than manslaughter. However much the distinction of race is observed in society, no distinction of race, color or previous condition is made by the law of this State, and we understand, under the circumstances above detailed, appellant evidently was laboring under intense excitement and fear either for his life or that he apprehended the most serious bodily injury would be inflicted upon him. If he was merely prompted by fear in doing the shooting, he might be guilty of manslaughter. If he apprehended, at the time, that his life was in danger or his person in danger of serious bodily injury by the peculiar menacing attitude and circumstances then surrounding him, and so apprehending harm he shot and killed, it occurs to us the jury would be warranted in believing that from his standpoint he had a right to do so, and he would not be guilty of any offense at all, but the same would be self-defense.

Various errors are alleged in appellant's motion for a new trial, but in view of the remarks heretofore made, we do not feel called upon to review same. But for the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*